## Risley's Estate,

*Trusts and trustees—Substituted trustee retaining assets of the original trust—Consent of residuary legatees—Instruction in letter on the subject.*

1. Where the attorney for residuary legatees who were entitled, as remainder-men, to a fund held in trust, where the will gave the trustee power to invest in non-legal securities, wrote to the attorney for the substituted trustee about the time the trustee assumed control of the estate, advising him, upon behalf of the remaindermen, that the securities in which the funds of the trust were invested and their value and standing had been "reviewed and we [the remaindermen and their attorney] know of no objection to the substituted trustee retaining said securities in his hands in the administration of said trust," such a letter is suffi-cient authority for the retention of the securities in question by the substituted trustee during the continuance of the trust unless countermanded, and, upon the audit of his account, filed on the death of the last life-tenant, such remaindermen cannot surcharge him for losses sustained by a shrinkage in value.

*Trusts and trustees—Commissions on income—Waiver.*

2. A trustee will not be allowed to retain, from the principal of the estate, unpaid commissions on income collected and paid over to annuitants.

*Principal and income—Premium on surety bond.*

3. A trustee will not be allowed to deduct premiums paid on his bond from principal, as such charges are payable only from the income.

*Commissions of substituted trustee — Rate — Term of service—Value of assets to be estimated at the termination of the trust.*

4. A substituted trustee who has served for eight years only will not be allowed to charge 5% on the principal of an estate appraised at $25,244.63. As commis-sions of a trustee are not due until the termination of the trust, they must be based on the present value of the assets upon which they are charged as distin-guished from their appraised value at an earlier period. Where the present value is between $14,000 and $15,000, a commission of 5% by a substituted trustee who has served only eight years is excessive; the court held that a round sum of $500 would be a proper compensation.

Exceptions to adjudication. O. C. Phila. Co., Oct. T., 1917, No. 438.

The facts and the relevant provisions of the will appear from the adjudica-tion of

GEST, J., Auditing Judge.—Jennie B. Risley died on June 10, 1914, leaving a will, by which she devised her residuary estate to Carleton E. Steelman in trust to pay over the net income *(a)* to her niece, Annie E. Lauer, the sum of $60 a month for her life; *(b)* the sum of $25 a month to F. B. W. Lauer for the term of his life; and the balance of said income to her cousin, Carleton E. Steelman, during the continuance of the trust. She further directed, upon the death of Annie E. Lauer or F. B. W. Lauer before the termination of the trust, the money theretofore paid to her or him should be paid to Carleton E. Steelman during the continuance of the trust, and upon the death of both Annie E. Lauer and F. B. W. Lauer the *corpus* should be divided and dis-tributed, *(a)* one-fifth to the Methodist Episcopal Home for the Aged for the endowment fund, provided that one-fifth of the *corpus* or principal should not exceed $5000, and if one-fifth of said trust fund should exceed $5000, then to pay to said Methodist Episcopal Home for the Aged for the endowment fund the sum of $5000; *(b)* one-fifth to the Methodist Episcopal Hospital for the endowment fund, provided the said one-fifth of the *corpus* or principal should not exceed $5000, and if the one-fifth of said trust fund should exceed $5000, then to pay to said Methodist Episcopal Hospital for the endowment fund $5000; and *(c)* the balance thereof to her cousin, Carleton E. Steelman, his heirs, executors, administrators and assigns, in fee simple.

Risley's Estate.

Carleton E. Steelman died on Oct. 14, 1917, and letters testamentary were granted to Florence M. Steelman, now Walton, and on Nov. 28, 1917, Frederick H. Woodhead, the present accountant, was appointed substituted trustee under the will of Jennie B. Risley. Florence M. Steelman, as executrix of Carleton E. Steelman, filed his account as executor of Jennie B. Risley, and, by adjudication of his account, the balance was awarded to Frederick H. Woodhead, as substituted trustee. F. B. W. Lauer died, according to the petition for distribution, on Oct. 7, 1924, but, as the account takes credit for payments of income to him as late as Oct. 20, 1926, this is probably a typographical error. Annie E. Lauer, who became, by marriage to Edwin Sooy, Annie E. Sooy, died Aug. 5, 1926, so that the trust has terminated. Annie E. Sooy left her surviving her husband, Edwin Sooy, and a minor child, Hazel Violet Sooy. . . .

The accountant claimed to be allowed as commissions on principal 5 per cent. on the total debits, which are $25,244.63, amounting to $1262.23, and, as commissions on income, 5 per cent. on the total debits, which are $10,452.24, making $522.61, of which $400 is credited in the income account, leaving $122.61 claimed from principal. The trustee also claimed to be allowed from principal $350, representing the annual charge of $50 made by the Kensington Trust Company as surety for seven years, 1920 to 1926, inclusive. These credits were objected to by the Methodist Episcopal Hospital and the Methodist Episcopal Home for the Aged, who, in addition, moved to surcharge the accountant with the depreciation of certain assets of the estate, viz., certain shares of Southern Transportation Company and certain shares of Miami Copper Company.

The facts as to these stocks appear to be substantially as follows:

The estate, when the account of the executor was audited and adjudicated, included 119 shares of Southern Transportation Company, carried at $100 per share, $11,900; and 80 shares of Miami Copper Company, carried at $42.50 per share, $3400.

The Southern Transportation Company stock was an investment made by the testatrix herself. The Miami Copper Company stock was an investment made by Carleton E. Steelman, the original trustee. The Southern Transportation Company is engaged in the transportation of freight by barges on inland and coastwise waters of the Atlantic coast between Norfolk and New England. It is a New Jersey corporation. The stock of the company is not listed. The business offices of this company are in the Commercial Trust Building, Philadelphia. It was chartered in January, 1901, with a capital stock of $100,000 and increased in 1907 to $250,000. In January, 1911, the capital stock was increased to $1,000,000, and in 1915 increased to $1,250,000, and in 1917 to $2,500,000, and in August, 1920, it was further increased to $5,000,000. The amount of common stock issued and outstanding prior to August, 1920, was $1,750,000, and it was increased in August, 1920, to $3,000,000, issued and outstanding, by the declaration of the stock dividend at that time. In 1915, 1916 and 1917 this company issued preferred stock, amounting to a total of $250,000, of the par value of $100 per share. This is outstanding. In January, 1913, the company sold $100,000 7 per cent. Debenture Bonds. The Debenture Bonds were paid off in 1924. The company issued and sold in February, 1920, $1,500,000 7 per cent. Marine Equipment Bonds and $500,000 in common stock to pay for certain boats purchased from the United States Government. Marine Equipment Bonds to the extent of $750,000 were paid off between 1920 and 1925, and subsequently bonds to the extent of $3,000,000 were paid off; the balance of these bonds outstanding as

of Jan. 1, 1927, is $450,000. In 1917 the capital of this company was $1,250,000, made up of 12,500 shares of common and preferred stock of the par value of $100. The barges and boats which have been operated for transportation covered inland trade and coastwise. At the present time there are 100 barges having a capacity from 500 to 4000 tons each and seventeen steam tugs. The company runs two shipyards, one at Chesapeake City, Maryland, and one at Norfolk, Virginia. The dividend on 119 shares of said stock was declared semi-annually at the rate of 12 per cent, per annum from February, 1918, to and including August, 1920. In August, 1920, in addition to the dividend at the rate of 12 per cent. on said stock, a common stock dividend was declared, whereby the capital of the company was increased by $1,250,000. This trust estate received 85 shares as its share of the stock dividend. In February, 1921, by reason of the stock dividend, the dividend was reduced from 12 per cent. to 7 per cent. per annum. No subsequent dividend on this stock was declared until September, 1925, when a 1 per cent. dividend was declared. The dividend of 7 per cent. per annum on the preferred stock of this company has been paid to date. The reason no dividend was declared on the common stock after February, 1921, with the exception of the dividend in 1925, was because of the payments necessary each year in the retirement of bonds and the depressed business due to shrinkage in tonnage and by reason of competition by boats sold by the United States Government to other concerns engaged in the coastwise business. 119 shares of this stock were received by the late Jennie B. Risley, the decedent, in the distribution of the estate of her husband, Ezra B. Risley. It was held by testatrix and passed into the administration of her estate. The stock was taken over by the substituted trustee in 1917 at $100 per share.

The facts as to the Miami Copper stock are substantially as follows: This is a corporation under the laws of Delaware, and the mines are located in Arizona. Its capital is $3,735,570, all of which is common stock, and the par of said stock is $5 per share. This company declared a dividend of 30 per cent, or $1.50 per share, quarterly in December, 1917, and February, 1918. The dividend was declared every three months. From May, 1918, to February, 1919, a dividend of 20 per cent., or $1 per share quarterly, was declared on said stock. In May, 1919, the dividend dropped to 50 cents per share quarterly, and this continued to and included February, 1925. In May, 1925, the dividend dropped to 25 cents per share quarterly, and this continued to August, 1926, inclusive. In November, 1926, the dividend was increased to 37½ cents per share quarterly, and this dividend was declared in January, 1927. This is confirmed in the testimony of John W. Sparks, Esq.

On March 16, 1918, soon after the appointment of the present accountant as substituted trustee, Mr. Rumsey, who appeared at the audit for the Methodist Episcopal Hospital and Methodist Episcopal Home for the Aged, wrote the following letter to A. T. Bauerle, Esq., who at that time represented the present accountant as substituted trustee: "Dear Sir: You represent the Substituted Trustee in the above Estate. You have submitted to us, for consideration, the securities in said Trust Estate, which are: Six $1000 Bonds of the Kenmore Pulp and Paper Company; 119 shares of stock of the Southern Transportation Company; 80 shares of stock in the Miami Copper Company. We represent: (a) Methodist Episcopal Home for the Aged of Philadelphia; (b) Methodist Episcopal Hospital in the City of Philadelphia, and said institutions are residuary legatees under the Will of the late Jennie B. Risley. On behalf of said residuary legatees, we beg to advise you that the said securities and their value and standing have been reviewed, and we

know of no objection to the Substituted Trustee retaining said securities in his hands in the administration of said trust."

And Annie E. Lauer stated in writing under date of March 21, 1918: "Mr. Edgar C. Van Dyke. Dear Sir: It is my desire to inform you that I am willing that the securities of the Estate of Jennie B. Risley will continue to be held by the Trustee (Mr. F. Woodhead)."

And Edgar C. Van Dyke, Esq., as counsel, wrote the following letter under date of March 28, 1918, to Mr. Bauerle: "Dear Sir: Confirming our telephone conversation of to-day in reference to Annie E. Lauer, permit me to enclose herewith a letter from Miss Lauer, in which she consents to the trustee holding the present securities in the Estate of Jennie B. Risley. Please acknowledge receipt of same and oblige."

These letters were transmitted to Mr. Woodhead by Mr. Bauerle on March 29, 1918. Mr. F. B. Warner Lauer and Annie E. Lauer, under date of April 2, 1918, wrote the following letter to Mr. Woodhead: "This is to certify that I hereby consent and agree to your holding as Trustee in the Estate of Jennie B. Risley, deceased, the following securities (although not technically what is known as legal securities), viz.: Kenmore Pulp and Paper Company bonds, Southern Transportation Company stock and Miami Copper stock, and I leave it entirely to your discretion to dispose of the same or any part thereof at any time you should deem it to the best interests of the estate."

Florence M. Steelman, under date of April 2, 1918, wrote the following letter to Mr. Woodhead: "This is to certify that I hereby consent and agree to your holding as Trustee in the Estate of Jennie B. Risley, deceased, the following securities (although not technically what is known as legal securities), viz.: Kenmore Pulp and Paper Company bonds, Southern Transportation Company stock and Miami Copper stock, and I leave it entirely to your discretion to dispose of the same or any part thereof at any time you should deem it to the best interests of the estate."

The $6000 Kenmore Pulp and Paper Company bonds were paid off, $2000 at par and $4000 at a premium of 5 per cent., as appears by the account and page 14 of the testimony.

It is claimed on behalf of the remaindermen that the provision in the will allowing the trustee to "invest in such manner as he shall deem proper, whether or not the investments so made are of the class commonly known as legal securities," did not excuse him from liability for their depreciation, where, as it is claimed in this case, he did not exercise the prudent judgment required of a fiduciary in the retention of the securities, and that he should now be charged with the loss. In the case of the Southern Transportation Company, Mr. Rumsey claimed that the trustee should at least be charged with the difference between $100 per share and the value in 1921, when the dividend was reduced, when, it was claimed, he should have sold it. As it did not appear there were any sales, public or private, made at that time, it would be difficult to assess the damages. In the case of the Miami Copper stock, it was claimed, as I understand the brief of argument, that the trustee is responsible for the difference between the highest value of the stock in May, 1918, and the present selling price. The stock, according to the testimony, sold in 1918 at various prices from 22½ to 33¼, and is now worth about 16½, so that it would be somewhat difficult to arrive at an exact calculation. These matters might, perhaps, open a field for discussion, were it not for the authority given in the will and the express permission and authority given by Mr. Rumsey himself, together with all other persons interested, to the retention of these specific investments, when the present accountant took them over from his predecessor,

as above stated. Mr. Rumsey, indeed, went so far in his brief as to urge, in reference to the Miami Copper stock, that the trustee should be surcharged with the difference in value of the stock in 1917, when he was appointed trustee, and the present selling price of the stock, stating that "he should have sold it immediately, notwithstanding the provisions of the will or the assent of the parties." I cannot understand how it is possible for any one to advance such an argument. The trustee, when he was appointed and ascertained the nature of the securities about to be transferred to him, acted prudently in obtaining the advice and consent of all the parties interested, and they all answered explicitly. Mr. Rumsey stated in his letter of March 16, 1918, "the said securities and their value and standing have been reviewed, and we know of no objection to the substituted trustee retaining said securities in his hands in the administration of the trust." In my opinion, this authority was good until it should be countermanded. Mr. Rumsey and his clients had reviewed the value and standing of the securities and knew as much about them as the trustee, and with this knowledge had no objection to his retaining them "in the administration of the trust." If this does not refer to the period of the trust I do not know what it means. Certainly the trustee would naturally take this to be Mr. Rumsey's meaning. If Mr. Rumsey or his clients had afterward obtained any information concerning the "value and standing" of the securities—and his means of information were as good as the trustee's—he should have at least called the latter's attention to the facts and either advised or demanded a sale. I do not think, from a consideration of the testimony, that in all the circumstances of the case the trustee is chargeable with such negligence as to warrant a surcharge. The authority in the will to invest in non-legal securities was very full, every party in interest was consulted in reference to these specific securities, and all agreed to their retention, and when the depreciation set in the trustee made reasonable inquiry and may well have supposed, for no one can foretell the future, that the stocks would regain their value. If this had happened after he had sold the stocks, the Methodist charities would probably have complained of the trustee's action. In short, the position now assumed by the remaindermen would enable them to blow hot or cold as they pleased, and to claim a surcharge if the trustee had sold and then the securities went up in value, or if, as in this case, the trustee retained them and they depreciated. I need only to refer to Armitage's Estate, 195 Pa. 582, and what was said in Detre's Estate, 273 Pa., at page 346, and Brown's Estate, 287 Pa. 504. The position assumed by the remaindermen in this case does not commend itself to me, and I dismiss their claim of surcharge.

2. The accountant claimed to be allowed from the principal of the estate the sum of $122.61, representing unpaid commissions on the income collected and paid over to the annuitants. This cannot be allowed. Commissions on income are deductible from income, and if the trustee fails to deduct them and pays over the income to the annuitants, he cannot throw this expense on the remaindermen: Arata's Estate, 7 D. & C. 135.

3. The accountant also claims to deduct from principal the premiums paid or for which he is liable to the Kensington Trust Company as surety on his bond, but it is clear that these charges are properly deductible from income, and it was the trustee's business so to charge them. These premiums for the years 1920 to 1926, inclusive, at $50 per annum, amount to $350. The claim is dismissed under the authority of Crawford's Estate, 256 Pa. 504; 62 Pa. Superior Ct. 329, and Werninger's Estate, 30 Dist. R. 6.

4. The trustee claimed the commissions, amounting to $1262.23, being 5 per

Risley's Estate.

cent. on $25,244.63, which included the assets awarded to him upon the adjudication of his predecessor's account, among which assets were 119 shares Southern Transportation Company, awarded at $11,900, 80 shares of Miami Copper Company, awarded at $42.50, or $3400, and also the 85 shares of stock dividend of the Southern Transportation Company at $30 a share, or $2550. Mr. Rumsey objected to the allowance of any commission at all, on the ground, principally, of the alleged neglect of duty by the trustee. With this extreme position I do not agree, as the trustee has acted bona fide and has not been guilty of wilful default or infidelity to his trust. But I do not now think he is entitled to charge the full rate of 5 per cent. upon the sum of $25,244.63. The commissions of a trustee on principal are not due until the termination of the trust, and that period having arrived, I think it is proper and right to take into consideration the present value of the assets upon which he is charging commissions and from which his commissions must be deducted. The present value appears to be $14,627.63, but as the trustee, who is not the original executor or trustee, has acted for only eight years, 5 per cent. would appear to be excessive. I am of opinion that a round sum of $500 would be proper compensation, and I award that amount.

*Frederick R. Gillinder* and *Horace M. Rumsey*, for exceptions.

*Mortimer N. Eastburn*, contra.

VAN DUSEN, J., April 22, 1927.—A careful review of this record justifies the action of the Auditing Judge, and for the reasons given by him, the exceptions are dismissed and the adjudication is confirmed absolutely.

Henderson, J., did not sit.

---

## Sagransky v. The Tokio Marine and Fire Insurance Co., Ltd.

*Fire insurance—Construction of policy—Clothing of customers left with tailor destroyed by fire.*

Under a clause in a policy of fire insurance "on merchandise generally, including packages, wrappers and labels of all kinds, his own, held in trust or on consignment, sold but not removed, for which the assured may be otherwise liable, being the stock of tailor shop," the assured, a tailor engaged in the business of cleaning, pressing, repairing and altering clothes for customers, may recover for customers' goods destroyed by a fire.

Rule for judgment for want of a sufficient affidavit of defence. C. P. No. 2, Phila. Co., Dec. Term, 1926, No. 17562.

*S. Nathaniel Golder*, for plaintiff; *Horace Michener Schell*, for defendant.

GORDON, JR., J., June 2, 1927.—This is a rule for judgment for want of a sufficient affidavit of defence. The plaintiff is a tailor who is engaged at No. 341 East Rockland Street, in a small way, in the business of cleaning, pressing, repairing and altering clothes for customers. A fire broke out on his premises, in which a quantity of his customers' goods were injured or destroyed. The defendant company, which had issued a policy of insurance upon the stock of plaintiff's shop, resists payment under the policy upon the ground that the injured goods are not covered by the terms of the policy. The clause of the policy defining the property covered by it reads as follows: "On merchandise generally, including packages, wrappers and labels of all kinds, his own, held in trust or on consignment, sold but not removed, for which the assured may be otherwise liable, being the stock of tailor shop."

It is contended, following the recent case of Cannon Mills, Inc., *v.* Flynn et al., 82 Pa. Superior Ct. 298, that the clause "for which the assured may